UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

UPSERVE, INC.,

                  Plaintiff,

v.

DAVID HOFFMAN and
SHIFT4 PAYMENTS, LLC,

                  Defendants.

C.A. No. 19-cv-00593-MSM-LDA

## FIRST AMENDED VERIFIED COMPLAINT

Plaintiff Upserve, Inc. ("Upserve") brings this action against Defendants David Hoffman ("Hoffman") and Shift4 Payments, LLC ("Shift4") (collectively, "Defendants"), stating as follows:

### INTRODUCTION

This is an action seeking injunctive relief based upon Hoffman's violation of his non-competition and non-disclosure covenants with Upserve and Shift4's tortious interference with those restrictive covenants, as well as violations of numerous federal laws based upon their unauthorized access to and misappropriation of Upserve's confidential and proprietary trade secret information.

Over a month before Hoffman's resignation from his position as Executive Vice President of Product at Upserve, Shift4 began recruiting Hoffman to be its Chief Product Officer. Hoffman and Shift4 analyzed Hoffman's restrictive covenant agreement with Upserve and determined that it prohibited him from working for Shift4. Nevertheless, they collectively

decided to flout the agreement and conceal Hoffman's new employment with Shift4 to diminish the chance that Upserve would be able to enforce the restrictive covenant agreement.

When Upserve nevertheless discovered Hoffman's new employment, Shift4 responded that it "provide[s] solutions to different market segments and different industry verticals" than Upserve. The undeniable evidence – including Shift4's own website and Hoffman's LinkedIn post about a speaking engagement on behalf of Shift4 concerning "Pay-at-the-Table for Restaurants" – demonstrates that Shift4's statement is simply false. In fact, in connection with discussions about attempting to divert Upserve's current restaurant-based customers to Shift4, Shift4's Chief Executive Officer specifically stated in writing that he hired Hoffman to compete with Upserve.

In addition to his extensive personal knowledge of Upserve's business and confidential information which he will inevitably disclose and use in his position with Shift4, Hoffman took with him without authorization thousands of documents containing Upserve's confidential and proprietary information. In particular, Hoffman stored over 1,800 confidential and proprietary Upserve documents in his personal "Dropbox" account in knowing violation of Upserve's clear written policies. And, forensic examination of Hoffman's Upserve-provided computer revealed that he accessed without authorization or legitimate purpose no fewer than 77 computer files containing confidential and proprietary Upserve documents after his resignation and before he returned the computer to Upserve.

In this action, Upserve seeks injunctive relief to prevent Hoffman from competing with it through his employment with Shift4 as he agreed to do in his employment agreement and to prevent Hoffman and Shift4 from using Upserve's trade secrets. It will not be possible for Hoffman to perform his new role without utilizing his extensive knowledge of Upserve's

2

confidential and proprietary information, including but not limited to the information contained in the documents that Hoffman misappropriated before returning his company-provided computer to Upserve. Without the injunction sought by Upserve, Hoffman and Shift4 will continue to use Upserve's confidential information (and the data that Hoffman misappropriated) to unfairly compete with Upserve in his nearly-identical role with a competitor in violation of his non-competition and non-disclosure covenants, and Upserve will be irreparably harmed.

## THE PARTIES/JURISDICTION/VENUE

1.      This action arises out of violations of the Defend Trade Secrets Act of 2016 ("DTSA"), 18 U.S.C. § 1836, *et seq.* and the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030 *et seq.*, and state law causes of action for breach of contract and breach of fiduciary duty.

2.      Upserve is a corporation organized under the laws of Delaware which maintains its principal place of business in Providence, Rhode Island.

3.      Hoffman is an individual and, on information and belief, currently resides in Warwick, Rhode Island. From July 2014 through his resignation effective August 2019, Hoffman was an employee of Upserve or its predecessor, Swipely, Inc. ("Swipely").

4.      Shift4 is a corporation organized under the laws of Delaware which maintains its principal place of business in Pennsylvania.

5.      This Court has subject matter jurisdiction pursuant to 18 U.S.C. §§ 1331, 1836(c), and 3231, because Upserve brings claims against Hoffman and Shift4 for violation of the DTSA and CFAA. Upserve's state law claims for breach of contract, breach of fiduciary duty, and tortious interference with contract are within the subject matter of this Court pursuant to 18 U.S.C. § 1838, and the Court has supplemental jurisdiction, pursuant to 28 U.S.C. § 1367,

3

because these state law claims are so closely related to the federal statutory claims that they form part of the same case or controversy.

6. Personal jurisdiction is proper in Rhode Island against Hoffman because he resides in Rhode Island and performed his work for Upserve while based primarily in Rhode Island.

7. Personal jurisdiction is proper in Rhode Island against Shift4 because Shift4 transacts business and employs employees in Rhode Island, including without limitation Hoffman.

8. Venue is proper in this forum, pursuant to 28 U.S.C. §§ 1391(b)(2), because a substantial part of the events or omissions giving rise to the claims herein occurred in this judicial district.

## FACTUAL BACKGROUND

### Upserve and Shift4 are Direct Competitors

9. Upserve is a leading restaurant management platform provider that allows independent full-service restaurants to run and manage their entire business, including restaurant-specific point of sale ("POS") software and associated hardware, pay-at-the-table software and associated hardware, payment processing, restaurant management software, restaurant inventory software, restaurant workforce software, analytics, online review monitoring, customer loyalty programs, and marketing tools, along with numerous additional functionality enabled through third-party integrations.

10. Since its inception in 2009, Upserve, formerly Swipely, has been constantly growing and evolving to most effectively service the restaurant and bar industry. Last year, Upserve managed over 36 million meals per month in thousands of restaurants across all 50 states and processed nearly ten billion dollars in annual sales.

4

11.     According to Shift4's website:

Shift4 Payments provides solutions and merchant services that add incredible value and streamline operations for any foodservice business. [Shift4] offer[s] a single, all-in-one solution that covers all your payments needs — including the top point-of-sale brands, the most secure payment technologies, point-to-point encrypted EMV devices, pay-at-the-table, full merchant services, and more.

12.     According to an article posted to Shift4's website entitled, "Shift4 Payments' Point-of-Sale Brands to Showcase Solutions at National Restaurant Association Show," dated May 3, 2018, Shift4 exhibited its four restaurant-focused POS systems and restaurant management software at the National Restaurant Association Show in May of 2018.  This article further stated, "Shift4's Future POS, Restaurant Manager, POSitouch and Harbortouch POS system brands will all be demonstrating their latest offerings for foodservice businesses, including updated software, new hardware, innovative back-end systems and accessories and their in-house payment processing capabilities."

13.     According to an article posted to Shift4's website entitled, "Shift4 Payments Unveils SkyTab, an Integrated Pay-at-the-Table Solution," dated May 15, 2019, Shift4 "unveiled SkyTab in May of 2019, which, in Shift4's words, "deliver[s] an exceptional pay-at-the-table experience for restaurants and their guests." This article further explained that SkyTab would allow restaurant wait staff to re-order menu items from their pay-at-the-table device, provide certain analytics to the restaurant owner or management, and allow customers to review their service before leaving the restaurant.

14.     According to an article posted to Shift4's website entitled, "Shift4 Payments to Showcase SkyTab Pay-at-the-Table Solution at HITEC," dated June 6, 2019, Shift4 "showcase[ed] their recently announced pay-at-the-table solution, SkyTab," at the HITEC trade show, and, according to Shift4, "SkyTab reaches guests wherever they are, including on-premise

4824-1207-1085.1

restaurants, poolside, bars or nightclubs...."

15.     According to an article posted to Shift4's website entitled, "Shift4 Payments Announces New Tableside Ordering Solution," dated August 26, 2019, "Shift4 ... today announced Tableside, a new order- and pay-at-the-table solution that will supply customers with a purpose-built tablet for mobile order entry and payment acceptance. The integrated solution includes both the tablet hardware and point-of-sale (POS) software." This article further describes that Shift4's "Tableside" would be used by restaurants to "eliminat[e] the need for waitstaff to walk back and forth to a stationary POS system...."

16.     In mid-October of 2019, Shift4 announced on its LinkedIn page:  "Shift4's Chief Product Officer, [Hoffman], will be speaking at #MUFSO 2019!" This LinkedIn post stated that Hoffman's presentation was entitled "Solving the Mobile Guest Experience" and provided a link for "SkyTab Pay-at-the-Table for Restaurants, Bars & Hospitality."

17.     Upserve provides all of the same services that Shift4 claimed that it provided in the articles and postings set forth in Paragraphs 11 to 16 above.   Upserve and Shift4 are direct competitors, and Shift4 vies for the same customers in the same markets that Upserve services across all 50 states.

### Upserve's Confidential Information and Trade Secrets

18.     Over many years of effort and at great expense, Upserve has developed, accumulated, maintained, and refined trade secrets and other confidential information, including, among other things, investment strategies, management planning information, business plans, operational methods, market studies, marketing plans or strategies, patent information, business acquisition plans, past, current, and planned reseárch and development, formulas, methods, patterns, processes, procedures, instructions, designs, inventions, operations, engineering,

6

services, drawings, equipment, devices, technology, software systems, price lists, sales reports and records, sales books and manuals, code books, financial information and projections, personnel data, customer pricing and purchasing information, lists of targeted prospective customers, supplier lists, product/service and marketing data and programs, product/service plans, product development, advertising campaigns, new product designs or roll out, and agreements with third parties ("Upserve Proprietary Information").

19.    During all relevant times, Upserve Proprietary Information was not generally known to the public.  Upserve takes measures to prevent Upserve Proprietary Information from becoming available to persons other than those selected by Upserve to have access to it.

20.    The Upserve Proprietary Information provided Upserve, during all relevant times, a significant competitive and economic edge over its competitors, including Shift4, which did not know or use the information (but which, if armed with the information, could unfairly utilize the information to develop competitive products, invade competitive markets without the significant expense that Upserve incurred to develop the Upserve Proprietary Information, and otherwise unfairly compete with Upserve).

21.    Upserve recognized the importance of safeguarding the Upserve Proprietary Information and, during all relevant times, took numerous steps to safeguard and limit access to such information.

22.    Among other things, during all relevant times, Upserve required all of its employees, including all of its vice presidents and executives, to execute employment agreements containing confidentiality, non-solicitation and non-competition covenants.

23.    During all relevant times, Upserve also maintained a System Security Policy in its Employee Handbook that required the confidential treatment and protection of Upserve

7

Proprietary Information by prohibiting employees from accessing files that they do not have permission to access, prohibiting employees from using personal online accounts for conducting Upserve business and further specifically prohibiting "[u]nauthorized review, duplication, dissemination, removal, damage, or alteration of files, or other property of Upserve, or improper use of information obtained by unauthorized means...." Hoffman was a member of Upserve's Security Committee, which is responsible for providing input and support to ensure that the implementation of security controls and policy requirements remain strong, appropriate and in alignment with the needs of the business. The Security Committee is the approving body for all of Upserve's security policies, including the System Security Policy.

24. To further protect its information, Upserve requires all employees, including Hoffman, promptly upon termination of employment, to return all Upserve property and information.

25. As an Upserve executive, Hoffman developed and/or was provided with relevant Upserve Proprietary Information so that he could efficiently develop new products, business, and strategies on behalf of Upserve.

### Hoffman's Employment with Upserve

26. From July 2014 through July 2017, Upserve employed Hoffman as its Vice President of Business Development. In that role, at various times during this time period, Hoffman reported to Upserve's Chief Financial Officer, Chief Executive Officer, and both Upserve's CEO and its Board of Directors.

27. In or about July of 2017, Hoffman became Upserve's Vice President of Corporate Development. In that role, Hoffman reported to Upserve's CEO and its Board of Directors.

8

28. In his positions as Vice President of Business Development and Vice President of Corporate Development, Hoffman was responsible for, among other things, developing and executing strategies to enhance Upserve's market position and growth, influencing strategy and execution across the organization, performing and maintaining competitive analyses on various companies' market offerings, leading strategic decisions concerning mergers and acquisitions, identifying market trends and pricing/business models, and participating in discovery and analyses of other business opportunities. In addition, it was crucial for Hoffman to analyze trends of the industry and similar technologies in order for Upserve to expand (or decide not to expand) into emerging markets.

29. In December of 2018, Upserve promoted Hoffman to Executive Vice President of Product. As EVP of Product, Hoffman was one of eight people (including the CEO) on Upserve's Executive Team. The Executive Team is collectively responsible for, among other things, the development and implementation of Upserve's competitive business strategy.

30. Prior to offering Hoffman the position of EVP of Product, Upserve required him to create a "Product Roadmap" analyzing Upserve's market and competitive landscape, objectives and investment summaries, strategies concerning Upserve's expansion into different markets and different technologies, and retention improvement strategies. Hoffman presented this "Product Roadmap" to Upserve's Board of Directors, and, based in part on Hoffman's strategies presented therein, Upserve offered him the position of EVP of Product.

31. As EVP of Product, in addition to the duties performed as VP of Business Development and VP of Corporate Development, Hoffman was responsible for the long-term vision, strategic direction, and successful execution of Upserve's technology and product portfolio roadmaps. Among other things, it was crucial that Hoffman continuously drive

9

4824-1207-1085.1

innovation in Upserve's products, collaborate with Upserve's engineering division to successfully deliver on product vision, lead the strategy underpinning Upserve's cloud and technical infrastructure, oversee high-level architectural decisions, drive platform integrations, manage cloud migrations, create and execute product roadmaps, define and support cross-function strategy, and manage user experience design and research to align products with market needs.

32.    Hoffman was a key leader and driver of Upserve's competitive business and product strategy.  Upserve required Hoffman to present Upserve's immediate and long-term competitive business and product strategy to the Board of Directors at every quarterly Board Meeting.

33.    Hoffman regularly updated his previously-created "Product Roadmap" throughout his tenure as EVP of Product in order to manage enhancements to Upserve's existing product offerings and to develop new product offerings and created other presentations concerning the competitive landscape and Upserve's current business, strategic growth, and product expansion. For example, Hoffman created presentations such as an "Inorganic Growth Strategy" to analyze the competitive marketplace and strategize Upserve's growth both within its current market and in other market segments; an "Upserve Enterprise" presentation dated April 3, 2019 which analyzed, among other things, key product investments for Upserve to make (and avoid) going forward, as well as sales and marketing investments; a market segment attack plan for a particular market segment that Upserve was (and is) considering pursuing, dated April 24, 2019; a "Product State & Delivery Priorities" analysis dated May 6, 2019, which analyzed the competitive landscape and initiatives for Upserve to implement going forward; a revised

10

"Product Roadmap" dated May 30, 2019; and an analysis of its tableside ordering system as compared to its competitors dated June 2019.

### Hoffman was Bound by Reasonable, Enforceable Restrictive Covenants

34.    During the course of his employment with Swipely and Upserve, Hoffman entered into agreements regarding the confidentiality of information obtained by him in the course of his employment and the obligation to keep such information confidential.

35.    In consideration of Hoffman's continued employment with Upserve, Hoffman and Upserve most recently entered into an "Employment and Restrictive Covenants Agreement," which both parties executed on July 13, 2017 (the "Restrictive Covenant Agreement" or the "Agreement"). A true and accurate copy of the Restrictive Covenant Agreement is incorporated herein by reference and attached hereto as Exhibit A.

*Non-Competition Restrictive Covenant*

36.    In Paragraph 8 of the Restrictive Covenant Agreement, captioned, "**LIMITED NONCOMPETE AGREEMENT**," Hoffman "expressly agree[d] that [Hoffman] will not (either directly or indirectly, by assisting or acting in concert with others) Compete with the Company during the Restricted Period within the Restricted Territory."

37.    Paragraph 13(b) defines the term "Compete" to mean "to provide Competitive Services, whether [Hoffman] is acting on behalf of himself/herself, or in conjunction with or in concert with any other entity, person, or business."

38.    Paragraph 13(c) defines the term "Competitive Services" to mean "the business of providing products or services (including but not limited to technical and product support, professional services, technical advice and other customer services) of the type provided,

11

conducted, or offered by the Company or any predecessor within the two (2) years prior to the termination of your employment."

39.     Paragraph 13(h) of the Restrictive Covenant Agreement defined the "Restricted Period" to mean the entire term of Hoffman's employment with Upserve and a one (1) year period following termination of his employment, and Paragraph 13(i) defined the term "Restricted Territory" to mean "the geographic area in which or with respect to which [Hoffman] provided or attempted to provide any Services or performed operations on behalf of the Company as of the date of termination or during the twelve (12) months preceding [Hoffman's] termination date." As Upserve's EVP of Product, Hoffman provided services on behalf of Upserve nationwide.

40.     Paragraph 13(k) defined "Services" to mean "the types of work product, processes and work-related activities relating to the Business of the Company performed by Employee during the Employment." Paragraph 2 of the Restrictive Covenant Agreement defines the "Business" of the Company to include "the business of investing and operating in software and technology-enabled businesses, including a continuous program of research, development, production and marketing."

41.     Paragraph 12 of the Restrictive Covenant Agreement, captioned, "**INJUNCTIVE RELIEF; TOLLING**," provides, in relevant part, as follows:

> [Hoffman] understands that the violation of any restrictive covenants of this Agreement may result in irreparable and continuing damage to [Upserve] for which monetary damages will not be sufficient, and agrees that [Upserve] will be entitled to seek, in addition to its other rights and remedies hereunder or at law and both before or while an arbitration is pending between the parties under this Agreement, a temporary restraining order, preliminary injunction or similar injunctive relief from a court of competent jurisdiction in order to preserve the status quo or prevent irreparable injury pending the full and final resolution of the dispute through arbitration, without the necessity of showing any actual damages or that monetary damages would not afford an adequate remedy, and without the necessity of posting

12

any bond or other security. ... The Restricted Period as defined in this Agreement may be extended during the pendency of any litigation (including appeals) or arbitration proceeding, in order to give [Upserve] the full protection of the restrictive covenants as described in this Agreement.

*Non-Disclosure, Return of Property, and Duty of Loyalty Restrictive Covenants*

42.   Paragraph 6(a) of the Restrictive Covenant Agreement, captioned,

"**NONDISCLOSURE AGREEMENT**," provides, in relevant part, as follows:

[Hoffman] expressly agrees that, throughout the term of [Hoffman's] Employment with the Company and at all times following the termination of [Hoffman's] Employment from the Company, for so long as the information remains confidential, [Hoffman] will not use or disclose any Confidential Information disclosed to [Hoffman] by the Company, other than for the purpose to carry out the Employment for the benefit of the Company (but in all cases preserving confidentiality by following the Company's policies and obtaining appropriate non-disclosure agreements). [Hoffman] shall not, directly or indirectly, use or disclose any Confidential Information to third parties, nor permit the use by or disclosure of Confidential Information by third parties.... [Hoffman] acknowledges that if [Hoffman] discloses or uses knowledge of the Company's Confidential Information to gain an advantage for [Hoffman], for any Competing Business, or for any other person or entity other than the Company, such an advantage so obtained would be unfair and detrimental to the Company.

43.   Paragraphs 13(d) and 13(e) define the terms "Competing Business" and

"Confidential Information," respectively, as follows:

d.   **"Competing Business"** shall mean any entity, including but not limited to any person, company, partnership, corporation, limited liability company, association, organization or other entity that provides Competitive Services.

e.   **"Confidential Information"** shall mean sensitive business information having actual or potential value to the Company because it is not generally known to the general public or ascertainable by a Competing Business, and which has been disclosed to [Hoffman], or of which [Hoffman] will become aware, as a consequence of the Employment with the Company, including any information related to: the Company's investment strategies, management planning information, business plans, operational methods, market studies, marketing plans or strategies, patent information, business acquisition plans, past, current and planned research and development, formulas, methods, patterns, processes, procedures, instructions, designs, inventions, operations, engineering, services, drawings, equipment, devices, technology, software systems, price lists, sales reports and records, sales books and manuals, code books, financial information

13

and projections, … customer pricing and purchasing information, lists of targeted prospective customers, supplier lists, product/service and marketing data and programs, product/service plans, product development, advertising campaigns, new product designs or roll out, agreements with third parties, or any such similar information. … Confidential Information may be in written or non-written form, as well as information held on electronic media or networks, magnetic storage, cloud storage service, or other similar media. The Company has invested and will continue to invest extensive time, resources, talent, and effort to develop its Confidential Information, all of which generates goodwill for the Company. Employee acknowledges that the Company has taken reasonable and adequate steps to control access to the Confidential Information and to prevent unauthorized disclosure, which could cause injury to the Company. This definition shall not limit any broader definition of "confidential information" or any equivalent term under applicable state or federal law.

44. In Paragraph 6(b) of the Restrictive Covenant Agreement, Hoffman "expressly agree[d] that [his] duty of non-use and non-disclosure shall continue indefinitely for any information of the Company that constitutes a Trade Secret under applicable law, so long as such information remains a Trade Secret." Paragraphs 6(c) and 6(d) of the Restrictive Covenant Agreement includes notice of the DTSA's immunity provision, as required by 18 U.S.C. § 1833.

45. Paragraph 7 of the Restrictive Covenant Agreement, captioned, "**RETURN OF COMPANY PROPERTY AND MATERIALS**," provides, in relevant part, as follows:

Any Confidential Information, trade secrets, materials, equipment, information, documents, electronic data, or other items that have been furnished by the Company to Employee in connection with the Employment are the exclusive property of the Company and shall be promptly returned to the Company by Employee, accompanied by all copies of such documentation, immediately when the Employment has been terminated or concluded, or otherwise upon the written request of the Company. Employee shall not retain any copies of any Company information or other property after the Employment ends, and shall cooperate with the Company to ensure that all copies, both written and electronic, are immediately returned to the Company.

46. Paragraph 4 of the Restrictive Covenant Agreement, captioned, "**DUTY OF LOYALTY**," provides, in relevant part, as follows:

Employee understands that his/her employment and provision of services on behalf of the Company requires Employee's undivided attention and effort. Accordingly, during Employee's employment, Employee agrees that he/she will not, without the

14

Company's express prior written consent, ... (iii) take steps, alone or with others, to engage in competition with the Company in the future, or (iv) appropriate for Employee's own benefit business opportunities pertaining to the Company's Business.

*Attorneys' Fees Provision*

47.     Paragraph 11 of the Restrictive Covenant Agreement provides, in relevant part, as follows: "Employee agrees and acknowledges that any such violation or threatened violation shall cause irreparable injury to [Upserve] and that, in addition to any other remedies that may be available in law, in equity, or otherwise, [Upserve] shall be entitled ... to recover any costs or attorneys' fees, arising out of or in connection with any breach by Employee or enforcement action relating to Employee's obligations under this Agreement."

### Shift4 Recruits Hoffman to Compete with Upserve's Restaurant Management Platform and Steal Upserve's Proprietary Information Including its Analytics

48.     On May 30, 2019, while Hoffman was still employed by Upserve, he sent an email to Daniel Drasin, Chief Development Officer at Shift4, attaching the Restrictive Covenant Agreement and stating: "Please see the attached letter, section 8/page 6. I will send you my resume later today, unless you tell me the agreement is a non-starter." The non-competition provision of the Restrictive Covenant Agreement is located in paragraph 8, on page 6.

49.     On June 3, 2019, Hoffman sent Mr. Drasin a copy of his resume. (Exhibit 14 to Hoffman Dep. In his resume, Hoffman falsely reported that he held the position of "EVP, Product" from "7/2014 – Current."

50.     On June 18, 2019, Shift4's Chief Executive Officer, Jared Isaacman, emailed Hoffman, stating that Shift4 "would like to put an offer in front of [him] for a Chief Product Officer position at Shift4." Hoffman responded:

I think this opportunity is very exciting and would love to join your team. My only challenge is the [Restrictive Covenant Agreement] and I need to get comfortable with my position if they decide to raise an issue. Would appreciate any suggestions

15

you have on this topic. But aside from this I am very interested in moving forward.

51.     On June 18, 2019, Mr. Isaacman sent to Hoffman by email an offer letter for the

Chief Product Officer position at Shift4, requested that Hoffman send him a copy of the

Restrictive Covenant Agreement for his review, and stated:

> We think we have a few ways we can attack this. As mentioned though, in 20 years
> in business we have never had a competitor pursue one of our hired executives or
> the company for violation of a non-compete. Defeating the "right to work" standard
> is a high bar to overcome. We also think there are some relationships at Searchlight
> we can lean on at Vista if required.

Mr. Isaacman did not mention that he did not believe Upserve and Shift4 to be competitors

in his June 18, 2019 email to Hoffman.

52.     On June 19, 2019, Hoffman emailed Mr. Isaacman a copy of the Restrictive

Covenant Agreement and stated, "I've had conversations with HR and legal counsel and plan to

get a more formal legal review ASAP, and appreciate any guidance you can provide as well."

53.     On June 25, 2019, Hoffman emailed Mr. Isaacman and asked if Shift4 would

agree to assist him in the event that Upserve enforced the Restrictive Covenant Agreement.

54.     On June 26, 2019, Shift4's General Counsel, Jordan Frankel, sent Hoffman an

email attaching a "Transition Assistance" agreement, pursuant to which Shift4 agreed to pay

Hoffman's legal fees in the event that Upserve enforced the Restrictive Covenant Agreement.

**Hoffman Waits for His Stock Options to Vest Then Resigns from Upserve**

55.     On June 28, 2019, Hoffman emailed Mr. Isaacman:

> When we were together at BWI I mentioned my upcoming options quarterly vest
> date on July 14. Thinking I could move things forward here following that date,
> and hopefully exit in two weeks from notice. So that would take me to July 29 or
> first week of August. Will that timing work for you and the team?

56.     On July 15, 2019, the day after Hoffman's stock options vested, he emailed a

resignation notice to Sheryl Hoskins, Upserve's CEO, stating that his resignation would be

16

effective August 2, 2019. The resignation letter stated that his "decision to leave Upserve after five years has been one of the hardest [he had] ever had to make," but did not state his reason for resigning from Upserve.

57.     Ms. Hoskins followed up with Hoffman to determine his reason for resigning from Upserve. Hoffman stated that he did not have another job and would be taking the summer off in order to, in his words, "see what I want to do." Hoffman further stated that he was considering selling his house and moving to Philadelphia to be closer to a family member who was experiencing difficulties at the time.

58.     Upon information and belief, Hoffman never listed his house for sale and did not take the summer off from working.

**Hoffman's Role at Shift4 Threatens Disclosure and Misuse of Upserve's Confidential and Proprietary Information and is in Direct Competition with His Former Role at Upserve**

59.     Upserve has maintained its position as the leading restaurant management platform by providing solutions for full-service restaurants to run and manage their entire business, including POS software, payment processing, analytics, inventory software, online ordering, review monitoring, and other tools.

60.     Shift4 has newly entered the restaurant-management market through the acquisition of multiple restaurant-specific POS systems and now provides products and services that are competitive to Upserve, including but not limited to its recent launch of its pay-at-the-table product, "SkyTab," and its order-at-the-table product, "Tableside."

61.     Because Hoffman has led efforts as Upserve's Vice President of Business Development and Vice President of Corporate Development to enhance its market position and growth, maintain competitive analyses on various competing companies' market offerings, lead its strategic decisions concerning mergers and acquisitions, and identify market trends and

17

4824-1207-1085.1

pricing/business models, Hoffman is uniquely positioned at Shift4 to use the confidential and proprietary information that he obtained through his employment at Upserve to determine which opportunities to pursue and forego and to negotiate competitively with Upserve with full knowledge of the confidential terms and conditions of Upserve's previous and ongoing negotiations.

62.     Because Hoffman was one of the eight key decision makers on Upserve's Executive Team which was responsible for development and implementation of Upserve's competitive business strategy, Hoffman is uniquely positioned at Shift4 to unfairly compete with Upserve for the same business opportunities that Upserve intends to pursue. Similarly, Hoffman is positioned to unfairly compete with Upserve by rejecting opportunities on behalf of Shift4 that Upserve has expended time, effort, and money to determine likely will not be economically or competitively advantageous.

63.     Because Hoffman led efforts as Upserve's EVP of Product in the seven months before his resignation, Hoffman is uniquely positioned as Chief Product Officer at Shift4 to know each and every detail of Upserve's next moves, including but not limited to strategies concerning Upserve's expansion into different markets and different technologies, retention improvement strategies, Upserve's technology and product portfolio roadmaps, and Upserve's product innovation. Hoffman would also be positioned to know the intimate details of Upserve's current processes and strategies, including, but not limited to, strategies underpinning Upserve's cloud and technical infrastructure, processes concerning high-level architectural decisions, currently-developing platform integrations, current research to align products with market needs, and Upserve's collaboration processes with its engineers.

18

64.     It is impossible to prevent Hoffman's knowledge from being used against Upserve.  Hoffman's knowledge of Upserve's business, including his intimate knowledge of Upserve's forecasted decisions and current processes and strategies, will allow him to strike more favorable deals with customers by undercutting Upserve's offers, take strategic steps to compete with Upserve in markets in which it (confidentially) intends to expand or avoid, unfairly negotiate with vendors by utilizing his knowledge of Upserve's agreements with those vendors, implement competitive operations at Shift4 to more quickly compete with Upserve after its recent entry into the competitive restaurant-based marketplace, and much more.  Hoffman's position also allows him to assist Shift4 in competing against Upserve while fully informed of the strategies Upserve has developed and deployed for competing against new market entrants like Shift4.

65.     Hoffman's possession of the Misappropriated Data will further put him in a position to, *inter alia*, undercut Upserve's payment processing and other pricing with its customers, model and undercut Upserve's deals with hardware storage and distribution vendor and its on-site implementation vendor, and undercut or otherwise competitively leverage the terms and conditions of Upserve's agreement with its payment processing vendors.

66.     Hoffman's knowledge and the Misappropriated Data in Hoffman's possession puts him in a position to usurp Upserve's business, customer, and product information and strategies for significant competitive advantage.  Armed with this information, Hoffman can (and will inevitably) utilize the information to develop competitive products, invade competitive markets without the significant expense that Upserve incurred to develop the Upserve Proprietary Information, and otherwise unfairly compete with Upserve.

4824-1207-1085.1

**Shift4 Admits that it Hired Hoffman to Misappropriate Upserve's Proprietary Information
and Trade Secrets to Develop Analytics Features Competitive to Upserve**

67.     Through point of sale data and guest names obtained from the guests' use of

credit cards and rewards programs, Upserve compiles data and provides analytics to restaurant

owners.  For example, Upserve products allow a restaurant owner to review, among other things,

names of guests, dining history, frequency of visits, sales and menu items consumed by the

guest.

68.     On October 14, 2019, in Shift4's communications with one of its vendors, Micros

Retail Systems, Inc. ("Micros"), a Technology Consultant for Micros stated:

> Upserve has become an obstacle in many of our groups including Soho House.
> The "analytics" are essential to operations with a few examples listed:
> > Identifies repeat customers
> > Where customers live
> > Items they order

> Dave Hoffman is new to Shift4 from Upserve which is a plus but to date I am [sic]
> have not received any information regarding S4 analytics to take on this challenge.

69.     Shift4's CEO, Mr. Isaacman, responded to the email referenced in the preceding

paragraph, stating:  "Lighthouse is our solution to beat Upserve analytics.  This is why we hired

Dave Hoffman to ensure our analytics are best in class, but it won't be there overnight.  Its [sic]

going to take time to achieve parity."

70.     After the email exchange referenced in the preceding paragraph, Hoffman added

that Shift4 is developing competitive analytics and, using his extensive knowledge of Upserve's

Proprietary Information, detailed how those analytics will compare to Upserve's through each

stage of development.

71.     On October 8, 2019, Samuel Brown, Shift4's Channel Sales Manager, emailed

Scott Carcillo, Shift4's Chief Information Security Officer, stating that an Upserve customer that

he was pursuing was "touting their analytics which is a story I have heard before."

20

4824-1207-1085.1

72.     On October 8, 2019, Mr. Carcillo responded to Mr. Brown's email referenced in
the preceding paragraph, stating: "Dave Hoffman is our new CPO and came from Upserve. I've
added him to offer perspective."

73.     On October 8, 2019, Hoffman stated that he was "familiar with this customer"
and asked to speak with Mr. Brown over the phone on October 9th or 10th.

74.     On October 11, 2019, Mr. Brown followed up with Hoffman concerning specific
analytics that the customer receives from Upserve and would be looking to achieve from Shift4.

75.     Shift4 hired Hoffman to misappropriate Upserve's Proprietary Information in
order to develop analytics competitive to Upserve's analytics.

**Hoffman's and Shift4's Concealment of His New Competitive Employment Delayed
Upserve's Discovery of Hoffman's Breach of the Restrictive Covenant Agreement**

76.     Hoffman's last day of work for Upserve was August 2, 2019. In mid-August,
Hoffman contacted Upserve to request information concerning the exercise of certain stock
options under the Stock Option Agreement entered into by Hoffman and Upserve on August 22,
2017. Under a Stock Option Agreement, Upserve may elect to repurchase Hoffman's option
shares at fair market value, or, alternatively, at the original cost if he was engaging in
competitive activity.

77.     On August 28, 2017, Upserve provided Hoffman with information concerning the
exercise of his stock options, as he had requested. In that same communication, Upserve stated:
"As part of your departure, we wanted to remind you of your obligations to abide by the
Restrictive Covenants as outlined in sections 8-10 (Limited Noncompete Agreement,
Nonsolicitation of Customers/Prospective Customers, Nonrecruitment of Employees), 16 (Non-
Disparagement), and 17 (Notification of New Employer) of the attached executed Employment
Agreement." Hoffman never responded to this communication.

4824-1207-1085.1

78.    In mid-October of 2019, Shift4 announced on its LinkedIn page: "Shift4's Chief Product Officer, [Hoffman], will be speaking at #MUFSO 2019!"  This LinkedIn post stated that Hoffman's presentation was entitled "Solving the Mobile Guest Experience" and provided a link for "SkyTab Pay-at-the-Table for Restaurants, Bars & Hospitality."  Upserve was surprised to learn that, after his resignation from his position as Executive Vice President of Product with Upserve, Hoffman took a position as Chief Product Officer with Upserve's direct competitor, Shift4.

79.    Upserve attempted to conduct a preliminary investigation of Hoffman's new employment with Shift4.  Although Shift4 had posted in a formal announcement the hiring of a new Chief Development Officer and Executive Vice President of Development in March of 2018, Shift4 did not even list Hoffman on the "Executive Team" page of its website.  In addition, although Hoffman had updated his LinkedIn page to set forth his departure from Upserve, he did not list his new employment at Shift4.

80.    On October 16, 2019, Upserve sent Hoffman a letter demanding that he cease and desist from violation of his restrictive covenants, including but not limited to violation of his non-competition agreement and his inevitable use of Upserve's confidential and proprietary information and trade secrets in violation of his non-disclosure agreement.

81.    Hoffman never responded to Upserve's cease and desist letter.

82.    On October 16, 2019, Upserve also sent a letter to Shift4, informing it of Hoffman's Restrictive Covenant Agreement, demanding that Shift4 cease and desist from employing Hoffman in violation of the Restrictive Covenant Agreement, and requesting that Shift4 confirm in writing that Hoffman has not disclosed any confidential or proprietary information.

83.     On October 20, 2019, Shift4, through Corporate Counsel, responded to Upserve's cease and desist letter, stating: "Shift4 does not consider Upserve to be a competitor.  We provide solutions to different market segments and different industry verticals."  This statement was false, as it is indisputable that Shift4 also services the point-of-sale restaurant industry and provides the same products and services as Upserve.  Moreover, Shift4's LinkedIn post concerning Hoffman's presentation on restaurant pay-at-the table systems demonstrates that he and Shift4 operate in at least some of the same market segments and verticals.

84.     Upon receipt of Shift4's letter stating that it would continue to employ Hoffman in violation of the Restrictive Covenant Agreement, Upserve promptly investigated the full extent of Hoffman's violations of his restrictive covenants.

85.     Upserve retained a third-party forensic examination vendor to conduct a forensic examination of Hoffman's company-provided laptop computer (the "Upserve Computer").  The results of the forensic examination indicated that, upon information and belief, Hoffman misappropriated Upserve Proprietary Information and trade secrets.

86.     Upserve received the results of the forensic examination on November 9, 2019, and promptly filed this action.

### Hoffman's Misappropriation of Upserve's Trade Secrets and Unauthorized Review, Duplication, and Removal of Upserve's Proprietary Information

87.     The forensic examination revealed that, on August 9, 2019, at 2:44pm, after Hoffman's resignation from Upserve but before he returned the Upserve Computer, Hoffman accessed no fewer than 77 computer files containing Upserve Proprietary Information.  Upserve did not authorize Hoffman to access these files and Hoffman had no legitimate reason to do so because he no longer worked for Upserve as of the date of access.

4824-1207-1085.1

88.     Hoffman utilized a personal "Dropbox" cloud-based storage system on the Upserve Computer. Upserve requires its employees to use its company-provided Google Drive and/or company-provided Box.com for cloud-based storage. Upserve prohibits its employees from using a personal Dropbox account (or any other personal online account) to store any Upserve file, let alone files containing Upserve Proprietary Information. Hoffman knew he was prohibited from storing Upserve files on his personal Dropbox account.

89.     Hoffman stored over 1,800 Upserve files in his personal Dropbox account. Many of the files that Hoffman uploaded to his personal Dropbox account contained Upserve Proprietary Information. For example, upon information and belief, the computer files that Hoffman accessed after his resignation from Upserve and/or the computer files uploaded to his personal Dropbox account (collectively, the "Misappropriated Data") included, but were not limited to, the following:

a.     Computer files listing the names of each and every Upserve customer that uses payment processing, along with each customer's contracted rates and various other financial information.

b.     Upserve's Master Agreement and Statement of Work with its third-party hardware warehousing and supply chain vendor that it retains to purchase, store, and distribute Upserve's hardware. Upserve's engagement with this vendor allows Upserve to sell hardware at competitive rates and ship to customers in an expedient manner.

c.     Upserve's Merchant Program Processing Agreement with First Data Merchant Services Corporation and Wells Fargo Bank, N.A., which includes Upserve's confidential rate schedule for payment processing, along with an amendment detailing previous and future rate reductions. In addition to Upserve's software-as-a-service

24

offerings, payment processing is a core feature of Upserve's business (and a core feature of Shift4's business, as well).

        d.     Upserve's master agreement, including its negotiated pricing schedule, with the third-party vendor it retains to perform on-site implementation of Upserve's products and services. Virtually every POS company contracts with a third party to perform these services, and Upserve's negotiated pricing allows it to offer customers competitive implementation rates.

        e.     Confidential documents concerning Upserve's negotiations with another third-party payment processing vendor, including documents provided as part of the due diligence process such as technical overviews and diagrams of key integration points that allow Upserve to provide its customers with portions of its products; documents reflecting Upserve's payment processing users and net payment processing revenues on a month-to-month basis; a document listing nearly 50 of Upserve's top referral partners with contact information (which, if known to Shift4, could readily be utilized to deploy such referral partners on its behalf); Upserve's audited and unaudited financial statements; and Upserve's federal tax returns.

        f.     Upserve's reseller agreement and negotiated pricing schedule with an integrated gift card vendor, which it recently launched as a new option for its customers.

        g.     Documents and other files related to several potential mergers and acquisition targets, including diligence, letters of intent, and other documents and information containing confidential information belonging to Upserve.

        h.     Diligence files and drafts of definitive agreements related to Upserve's acquisition of Breadcrumb POS from Groupon.

90.     In addition, the forensic examination indicated that, upon information and belief,

Hoffman copied potentially-sensitive documents from his previous employer, Micros POS

Solutions, from his personal Dropbox folder onto the Upserve Computer.  Upserve was unaware

that Hoffman had taken such documents from MICROS Systems, Inc.

91.     Enforcement of the covenant not to compete would protect Upserve's confidential

information (and the Misappropriated Data) by restricting Hoffman from working in a position in

which he can, and inevitably will, use the information against Upserve for a period of one year.

The non-compete period is narrowly tailored to protect Upserve's confidential information.

## CAUSES OF ACTION

### COUNT ONE
**(Breach of Contract)**
**(Against Hoffman)**

92.     Upserve repeats and realleges the allegations contained in the preceding

paragraphs of this Complaint as if set forth fully herein.

93.     The Restrictive Covenant Agreement is binding and enforceable.  Hoffman has

engaged in unfair competition and has already breached, and threatens to continue to breach, the

Restrictive Covenant Agreement by directly competing with Upserve in violation of his non-

competition agreement, using Upserve Proprietary Information in violation of his Non-

Disclosure Agreement, and misappropriating the Misappropriated Data in violation of his

contractual duty of loyalty, as alleged above.

94.     By copying the Misappropriated Data and/or otherwise taking with him copies of

Upserve's computer files, Hoffman has further breached his contractual duty to return Upserve

property to it upon separation from employment.

95.     Upserve has suffered, and will continue to suffer, irreparable harm as a result of Hoffman's conduct for which Upserve does not have an adequate remedy at law.  Upserve is entitled to preliminary and permanent injunctive relief.

96.     Unless injunctive relief is granted, Hoffman will continue to unfairly compete with Upserve and use Upserve Proprietary Information to cause further irreparable injury to Upserve.

**COUNT TWO**
**(Breach of Fiduciary Duty)**
**(Against Hoffman)**

97.     Upserve repeats and realleges the allegations contained in the preceding paragraphs of this Complaint as if set forth fully herein.

98.     By virtue of his position with Upserve, and the fact that he was entrusted with the confidential information of Upserve, Hoffman had a fiduciary duty to act in good faith in any matter relating to Upserve and not to engage in conduct that was disloyal to Upserve.

99.     Hoffman breached his fiduciary duty to Upserve by engaging in the conduct alleged above, including copying the Misappropriated Data, during his employment with Upserve and thereafter.

100.    It is a breach of Hoffman's continuing fiduciary duty to Upserve to capitalize on his wrongful conduct during his employment by Upserve and thereafter.

101.    Upserve has suffered, and will continue to suffer, irreparable harm as a result of Hoffman's wrongful conduct, for which Upserve does not have an adequate remedy at law.

4824-1207-1085.1

## COUNT THREE
### (Violation of the Defend Trade Secrets Act of 2016, 18 U.S.C. § 1836, *et seq.*)
### (Against Both Defendants)

102.    Upserve repeats and realleges the allegations contained in the preceding paragraphs of this Complaint as if set forth fully herein.

103.    By virtue of his contractual relationship with Upserve, Upserve gave the Hoffman access to trade secrets and confidential and proprietary information ("Trade Secret Information")—information that is valuable to Upserve's business and gives Upserve an advantage over competitors.

104.    The Trade Secret Information obtained by Hoffman relates to Upserve's business and services that are maintained and provided in interstate commerce.

105.    The Trade Secret Information obtained by Hoffman is a "trade secret" within the meaning of 18 U.S.C. § 1839(3) because, *inter alia*, it is secret and of value as a result of not being generally known as set forth above, and Upserve takes and has taken measures to prevent the secrets from becoming available to persons other than those selected by Upserve to have access thereto.

106.    By virtue of his contractual obligations and confidential relationship with Upserve, Hoffman had and has a duty to maintain the confidentiality of Trade Secret Information, as well as a continuing duty not to use, exploit, or divulge such information other than in connection with the performance of his duties for Upserve, for the benefit of Upserve, and pursuant to authorization from Upserve.

107.    Hoffman has maliciously and willfully misappropriated Upserve's Trade Secret Information by disclosure for the benefit of a direct competitor of Upserve.  Hoffman deliberately elected and maintained a course of conduct designed to disclose the Trade Secret

4824-1207-1085.1

Information to others in an effort to unfairly compete with Upserve, divert business opportunities to Shift4, and deprive Upserve of past and future profits.

108.    Shift4 has maliciously and willfully misappropriated Upserve's Trade Secret Information by acquisition.  Shift4 knew and had reason to know that it acquired the Trade Secret Information from Upserve through improper means, including without limitation theft, misrepresentation, breach of a duty to maintain secrecy, and violations of the Restrictive Covenant Agreement.

109.    As a result of the Defendants' misappropriation of Upserve's Trade Secret Information, Defendants have and continue to violate the Defend Trade Secrets Act of 2016, 18 U.S.C. § 1836(b)(1).

110.    Pursuant to Defend Trade Secrets Act of 2016, 18 U.S.C. § 1836(b)(3)(A), Upserve is entitled to preliminary and permanent injunctive relief.

111.    Unless injunctive relief is granted, Hoffman and Shift4 will continue to misappropriate and benefit from misappropriation of the Trade Secret Information and will continue to cause further irreparable injury to Upserve.

112.    By virtue of the Defendants' bad faith and willful and malicious misappropriation of Upserve's Trade Secret Information, Upserve is entitled to reasonable attorney's fees, as provided for by the Defend Trade Secrets Act, 18 U.S.C. §§ 1836(b)(3)(B)-(D).

### COUNT FOUR
**(Computer Fraud and Abuse Act, 18 U.S.C. § 1030 *et seq.*)**
**(Against Hoffman)**

113.    Upserve repeats and realleges the allegations contained in the preceding paragraphs of this Complaint as if set forth fully herein.

114.    Hoffman has accessed, or directed others to access, Upserve's protected computer

systems under false pretenses. He, or others at his direction, accessed Upserve's systems purportedly in furtherance of their work on behalf of Upserve. In reality, however, they, or others at their direction, accessed Upserve's systems at times in furtherance of his intention to unfairly compete against Upserve and/or misappropriate Upserve's Trade Secret Information. 18 U.S.C. § 1030(a)(4).

115.   Hoffman has done so without authorization or by exceeding such authorization granted by Upserve in connection with the Restrictive Covenant Agreement and/or Upserve's policies and practice.

116.   Hoffman has done so knowingly and with an intent to defraud Upserve.

117.   As a direct and proximate result of the Hoffman's wrongful conduct, Upserve has suffered and will continue to suffer irreparable harm that cannot be adequately redressed at law if not preliminarily and permanently enjoined.

118.   Pursuant to the Computer Fraud and Abuse Act, 18 U.S.C. § 1030(g), Upserve is entitled to preliminary and permanent injunctive relief.

## COUNT FIVE
### (Tortious Interference with Business Expectancies Against Shift4)

119.   Upserve repeats and realleges the allegations contained in the preceding paragraphs of this Complaint as if set forth fully herein.

120.   At all relevant times, Shift4 had knowledge of the existence and terms of the Restrictive Covenant Agreement.

121.   Shift4 has intentionally and improperly interfered with Upserve's contractual relationship with Hoffman, by inducing him to breach the Restrictive Covenant Agreement and by participating with Hoffman in such breach, as alleged herein.

4824-1207-1085.1

122.    Unless injunctive relief is granted, Shift4 will continue to employ Hoffman in violation of the Restrictive Covenant Agreement and will continue to cause further irreparable injury to Upserve.

WHEREFORE, Upserve respectfully requests that this Court:

1.    Enter a preliminary injunction:

(a)    Against Hoffman, and all those acting in concert with him or on his behalf, requiring him to cease and desist from directly or indirectly, whether on behalf of himself or in conjunction with any other entity, person, or business, providing products or services of the type provided, conducted, or offered by Upserve from August 2, 2017 through August 2, 2019, from the date of the preliminary injunction until the earlier of one (1) year from the date of the entry of the preliminary injunction or further action of the Court;

(b)    Against Hoffman requiring him to immediately cease employment with Shift4;

(c)    Against Defendants, and all those acting in concert with them or on their behalves, requiring them to cease and desist from any use and/or disclosure of and/or copying of any documents and information (and copies thereof) in their possession, custody or control, relating to the business of Upserve, including but not limited to the information copied from Hoffman's company-provided computer (collectively, the "Upserve Materials");

(d)    Against Defendants, and all those acting in concert with them or on their behalves, to preserve any and all documents (including documents in hard copy or electronic formats) in their possession, custody or control containing, relating to or embodying the Upserve Materials, and any and all documents (including documents in hard copy or electronic formats) in their possession, custody or control relating to Upserve or its customers;

31

4824-1207-1085.1

(e)      Against Defendants, and all those acting in concert with them or on their behalves, requiring them to provide an accounting of (a) all of the Upserve information received by Shift4 from Hoffman and/or his misappropriation of confidential and proprietary information from his Upserve-provided computer; and (b) all of the business and monies derived by Hoffman and/or Shift4 through Hoffman's and/or Shift4's use of the Upserve Materials.

2.      Enter a permanent injunction in accordance with Prayer 1(a), 1(b), 1(c), and 1(e) herein, and that requires Hoffman and Shift4 to return and/or permanently delete all Upserve Materials in their possession, custody, or control;

3.      Order Hoffman and/or Upserve to pay over to Upserve all monies derived by them from the sources specified in Prayer 1(e);

4.      Attorneys' fees as provided for in 18 U.S.C. §§ 1836(b)(3)(B)-(D);

5.      Attorneys' fees as provided for in the Restrictive Covenant Agreement;

6.      Costs; and

7.      Such other and further relief as this Court may deem proper.

## **RESERVATION OF RIGHTS**

Upserve reserves the right to seek damages against Hoffman through arbitration or otherwise, to the extent that those damages can be determined.

## **JURY DEMAND**

Pursuant to Federal Rule of Civil Procedure 38, Upserve hereby demands a trial by jury on all issues so triable.

Dated: January 29, 2020

4824-1207-1085.1

Respectfully submitted,

UPSERVE, INC.,

By its Attorneys,

/s/ Aaron F. Nadich
Neal J. McNamara (#4249)
Andrew B. Prescott (#3758)
Aaron F. Nadich (#9571)
One Citizens Plaza, Suite 500
Providence, Rhode Island 02903
(401) 454-1000
(401) 454-1030 (Facsimile)
nmcnamara@nixonpeabody.com
aprescott@nixonpeabody.com
anadich@nixonpeabody.com

## VERIFICATION

I, Sheryl Hoskins, Chief Executive Officer of Upserve, Inc., hereby certify that I have read the foregoing Verified Complaint, and that the facts set forth therein are true by my own personal knowledge and in accordance with the business records of the company, except those facts set forth on information and belief, and that as to those allegations, I believe them to be true.

Sheryl Hoskins
Chief Executive Officer
Upserve, Inc.

STATE OF RHODE ISLAND
COUNTY OF __Providence__

Signed and sworn to before me this 14th day of January, 2020.

Notary Public
My commission expires: __12/30/2020__

JOHN J. VAUGHN
Notary Public - ID #760156
State of Rhode Island
My Commission Expires 12/30/2020

33

4824-1207-1085.1

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent

electronically to the registered participants as identified on the Notice of Electronic Filing (NEF)

and paper copies will be sent to those indicated as non-registered participants on January 29,

2020.

/s/ Aaron F. Nadich

4824-1207-1085.1