UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

|  |  |  |
|---|---|---|
| UPSERVE, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 1:19-CV-00593-MSM-LDA |
| | ) | |
| DAVID HOFFMAN and | ) | |
| SHIFT4 PAYMENTS, LLC, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## MEMORANDUM AND ORDER

Mary S. McElroy, United States District Judge.

The Court considers two Motions for a Preliminary Injunction filed by the plaintiff, Upserve, Inc. ("Upserve") against the defendants, David Hoffman and Shift4 Payments, LLC ("Shift4"), respectively. The primary issue before the Court is the enforceability of a non-competition agreement between Upserve and Mr. Hoffman.

The Court heard oral argument on the Motions via telephone conference on March 20, 2020.[1] The parties waived live testimony. In advance of the hearing they filed extensive evidence by way of deposition testimony, affidavits, and other documents.

For the following reasons, the Court GRANTS IN PART and DENIES IN PART

---

[1] By agreement of all parties, the hearing was conducted telephonically as a measure of safety during the COVID-19 pandemic and pursuant to this Court's March 13, 2020, "General Order Regarding Continuity of Operations During Coronavirus Pandemic."

Upserve's Motion for a Preliminary Injunction Against David Hoffman (ECF No. 17) and DENIES Upserve's Motion for a Preliminary Injunction Against Shift4 (ECF No. 28).

## I.    BACKGROUND

### A.  Upserve, Inc.

Upserve describes itself as "a leading restaurant management platform provider that allows independent full-service restaurants to run and manage their entire business, including, among other things, restaurant-specific point of sale ('POS') software and associated hardware, pay-at-the-table software and associated hardware, payment processing, restaurant inventory software, restaurant workforce software, analytics, online review monitoring, customer loyalty programs, and marketing tools." (ECF No. 1 ¶ 7.)  On his resume, Mr. Hoffman described Upserve as a "technology & payments company." (ECF No. 18-6.)

Upserve products compile and provide data analytics to allow a restaurant owner to review information such as names of guests, dining history, frequency of visits, sales, and menu items consumed by the guest.  According to Mr. Hoffman, Upserve's analytics are the "best in the industry." (ECF No. 18 at 25.)

Over the years, Upserve has developed proprietary information that it credits with giving it a significant competitive and economic edge over its competitors.[2]

---

[2] This proprietary information includes: "investment strategies, business plans and strategies, market studies, marketing plans or strategies, business acquisition plans, past current, and planned research and development, product designs and features (including without limitation Upserve's analytics), product extensions, technology, software systems, price lists, financial information and projections, customer pricing

### B. David Hoffman's Employment at Upserve

From July 2014 through July 2017, Upserve employed Mr. Hoffman as its Vice President of Business Development and paid him a salary of $150,000 annually plus bonuses. (ECF No. 17-8.) In July 2017, Hoffman became Upserve's Vice President of Corporate Development with a raise in salary to $185,000 per year and increased bonus eligibility. (ECF No. 18-3.) Then, in December of 2018, Hoffman was promoted to Executive Vice President ("EVP") of Product with an increased salary of $220,000 annually and a bonus eligibility of up to 45% of his salary. (ECF No. 18-4.)

In his positions as Vice President of Business Development and Vice President of Corporate Development, Mr. Hoffman was responsible for, among other things, developing and executing strategies to enhance Upserve's market position and growth, influencing strategy and execution across the organization, performing and maintaining competitive analyses on various companies' market offerings, leading strategic decisions concerning mergers and acquisitions, and participating in discovery and analyses of other business opportunities. (ECF No. 27 ¶ 28.) In addition, Mr. Hoffman "[f]ocused on transformative growth through product innovation, go-to-market alignment, and inorganic opportunities." (ECF No. 18-6.) Mr. Hoffman also would analyze trends of the industry and similar technologies for Upserve to decide whether to expand into emerging markets. (ECF No. 27 ¶ 28.)

Prior to offering Hoffman the position of EVP of Product, Upserve required him

---

and purchasing information, supplier lists and agreements, product development, and agreements with third parties." (ECF No.1 ¶ 16.)

to create a "Product Roadmap" analyzing Upserve's market and competitive landscape, objectives and investment summaries, strategies concerning Upserve's expansion into different markets and different technologies, and retention improvement strategies. *Id.* ¶ 30. Based in part on this "Product Roadmap," Upserve promoted Mr. Hoffman to EVP of Product. *Id.*

As EVP of Product, in addition to the duties he performed in his previous roles, Mr. Hoffman was responsible for the long-term strategic vision, strategic direction, and successful execution of Upserve's technology and product portfolio roadmaps. *Id.* ¶ 31. Mr. Hoffman was a "key leader and driver of Upserve's competitive business and product strategy." *Id.* ¶ 32.

### 1. David Hoffman's Restrictive Covenants Agreement with Upserve

During his employment with Upserve, Mr. Hoffman entered into confidentiality agreements, most recently an "Employment and Restrictive Covenants Agreement" (the "Agreement"), executed on July 13, 2017. (ECF No. 18-5.) In addition to confidentiality obligations, the Agreement also included a non-competition provision. *Id.* ¶ 8. On December 7, 2018, upon his promotion to EVP, Hoffman executed an offer letter affirming his obligations under the Restrictive Covenants Agreement. (ECF No. 18-4.)

The relevant provisions of the Agreement are as follows:

### a. Non-Competition Restrictive Covenant

Paragraph 8 of the Agreement, titled "LIMITED NONCOMPETE AGREEMENT," provided that Mr. Hoffman "expressly agree[d] that [he] will not

(either directly or indirectly, by assisting or acting in concert with others) Compete with the Company during the Restricted Period within the Restricted Territory." (ECF No. 18-5 ¶ 8.)

The "Restricted Period" is defined as the entire term of Mr. Hoffman's employment with Upserve and a one-year period following termination of his employment. *Id.* ¶ 13(h). The term "Restricted Territory" means the "geographic area in which or with respect to which [Hoffman] provided or attempted to provide any Services or performed operations on behalf of the Company as of the date of termination or during the twelve (12) months preceding [Hoffman's] termination date." *Id.* ¶ 13(i).

The Agreement defines the term "Compete" to mean "to provide Competitive Services, whether [Hoffman] is acting on behalf of himself/herself, or in conjunction with or in concert with any other entity, person, or business." *Id.* ¶ 13(b). "Competitive Services" are defined as "the business of providing products or services (including but not limited to technical and product support, professional services, technical advice and other customer services) of the type provided, conducted, or offered by the Company or any predecessor within the two (2) years prior to the termination of your employment." *Id.* ¶ 13(c).

### b. Nondisclosure Agreement

Paragraph 6(a) of the Agreement, titled "NONDISCLOSURE AGREEMENT," provides in relevant part as follows:

> [Hoffman] expressly agrees that, throughout the term of [Hoffman's] Employment with the Company and at all times following the

termination of Employee's Employment from the Company, for so long as the information remains confidential, [Hoffman] will not use or disclose any Confidential Information disclosed to [Hoffman] by the Company, other than for the purpose to carry out the Employment for the benefit of the Company (but in all cases preserving confidentiality by following the Company's policies and obtaining appropriate non-disclosure agreements). [Hoffman] shall not, directly or indirectly, use or disclose any Confidential Information to third parties, nor permit the use by or disclosure of Confidential Information by third parties. … [Hoffman] acknowledges that if [Hoffman] discloses or uses knowledge of the Company's Confidential Information to gain an advantage for [Hoffman], for any Competing Business, or for any other person or entity other than the Company, such an advantage so obtained would be unfair and detrimental to the Company.

b. [Hoffman] expressly agrees that [Hoffman's] duty of non-use and non-disclosure shall continue indefinitely for any information of the Company that constitutes a Trade Secret under applicable law, so long as such information remains a Trade Secret.

Paragraphs 13(d) and 13(e) define the terms "Competing Business" and

"Confidential Information" as follows:

13(e) "Confidential Information" shall mean sensitive business information having actual or potential value to the Company because it is not generally known to the general public or ascertainable by a Competing Business, and which has been disclosed to [Hoffman], or of which [Hoffman] will become aware, as a consequence of the Employment with the Company, including any information related to: the Company's investment strategies, management planning information, business plans, operational methods, market studies, marketing plans or strategies, patent information, business acquisition plans, past, current, and planned research and development, formulas, methods, patterns, processes, procedures, instructions, designs, inventions, operations, engineering, services, drawings, equipment, devices, technology, software systems, price lists, sales reports and records, sales books and manuals, code books, financial information and projections, personnel data, names of customers, customer lists and contact information, customer pricing and purchasing information, lists of targeted prospective customers, supplier lists, product/service and marketing data and programs, product/service plans, product development, advertising campaigns, new product designs or roll out, agreements with third parties, or any such similar information. …

6

Confidential Information may be in written or non-written form, as well as information held on electronic media or networks, magnetic storage, cloud storage service, or other similar media. The Company has invested and will continue to invest extensive time, resources, talent, and effort to develop its Confidential Information, all of which generates goodwill for the Company. Employee acknowledges that the Company has taken reasonable and adequate steps to control access to the Confidential Information and to prevent unauthorized disclosure, which could cause injury to the Company. The definition shall not limit any broader definition of "confidential information" or any equivalent term under applicable state or federal law.

13(d) "Competing Business" shall mean any entity, including but not limited to any person, company, partnership, corporation, limited liability company, association, organization or other entity that provides Competitive Services.

### c.  Covenant to Return Company Property

Paragraph 7 of the Agreement, titled "RETURN OF COMPANY PROPERTY

AND MATERIALS," provides in relevant part:

Any Confidential Information, trade secrets, materials, equipment, information, documents, electronic data, or other items that have been furnished by the Company to [Hoffman] in connection with the Employment are the exclusive property of the Company and shall be promptly returned to the Company by [Hoffman], accompanied by all copies of such documentation, immediately when the Employment has been terminated or concluded, or otherwise upon the written request of the Company. [Hoffman] shall not retain any copies of any Company information or other property after the Employment ends, and shall cooperate with the Company to ensure that all copies, both written and electronic, are immediately returned to the Company.

### C.  Shift4 Payments, LLC

Shift4 is a payment technology company providing integrated payment

solutions and merchant services to a number of industries. Among Shift4's payment

and commerce services are POS products, offered to large national chains. This

includes providing restaurant management platforms to restaurant owners. Shift4

describes itself as "the industry-leading provider of Restaurant POS Software and Payments." (ECF No. 17-2.) It states on its website that it "provides solutions and merchant services that add incredible value and streamline operations for any foodservice business. [Shift4] offer[s] a single, all-in-one solution that covers all your payment needs—including the top point-of-sale brands, the most secure payment technologies, point-to-point encrypted EMV devices, pay-at-the-table, full merchant services, and more." *Id.*

Some of Shift4's products that provide the same services as Upserve's products include Lighthouse Business Management System (a customizable dashboard, advanced reporting, remote point-of-sale management, employee scheduling, customer engagement tools, online reputation management, and social media management); Tableside (a tablet computer for order- and pay-at-the-table solutions); and Skytab (a pay-at-the-table solution integrated with Lighthouse). (ECF No. 1 ¶ 15.)

Upserve has identified Shift4 as a competitor in its "Competitive Digest," a monthly newsletter distributed to employees to alert them of competitive announcements. Shift4 was so identified in May, August, and September 2019, editions. (ECF Nos. 24-1, 2, 3.) Shift4 is absent, however, in a series of slides Mr. Hoffman apparently created describing various Upserve competitors. (ECF No. 35-4.)

Shift4's Chief Technology Officer, Michael L. Russo, states by way of affidavit that while Shift4 was recruiting Mr. Hoffman, he and Mr. Hoffman discussed that

they did not view Upserve as a competitor to Shift4.  (ECF No. 31-2 ¶¶ 3-4.)

### D. Shift4's Hiring of Mr. Hoffman

On May 30, 2019, during his employment with Upserve, Mr. Hoffman sent an email to Daniel Drasin, Chief Development officer at Shift4, attaching the Agreement, and stating "I will send you my resume later today, unless you tell me the agreement is a non-starter." (ECF No. 18-6.) On June 3, 2019, Mr. Hoffman sent Mr. Drasin a copy of his resume.  *Id.*

On June 18, 2019, Shift4's Chief Executive Officer, Jared Isaacman, emailed Mr. Hoffman stating that Shift4 "would like to put an offer in front of [him] for a Chief Product Officer position at Shift4." (ECF No. 18-7.) Mr. Hoffman responded:

> I think this opportunity is very exciting and would love to join your team. My only challenge is the [Agreement] and I need to get comfortable with my position if they decide to raise an issue.  Would appreciate any suggestions you have on this topic.  But aside from this I am very interested in moving forward.
> *Id.*

On the same date, Mr. Isaacman sent Mr. Hoffman an offer letter for the Chief Product Officer position but also requested that Mr. Hoffman send him a copy of the Agreement for his review, stating:

> We think we have a few ways we can attack this.  As mentioned though, in 20 years in business we have never had a competitor pursue one of our hired executives or the company for violation of a non-compete. Defeating the "right to work" standard is a high bar to overcome.  We also think there are some relationships at Searchlight we can lean on at Vista if required.[3]
> *Id.*

---

[3] Searchlight Capital Partners is an investor in Shift4.  Vista Equity Partners is the majority owner of the corporations that control Upserve.

Mr. Hoffman emailed Mr. Isaacson again on June 25, 2019, to further discuss the Agreement:

> I've connected with an attorney on the non-compete and the conclusion I've reached is I'll be in a weak position if Vista chooses to pursue the agreement. I am product & strategy leader within the company and can certainly see them filing for injunction to prevent me working with anyone they consider to be a competitor. … However, I've heard what you've said about larger chips and believe Shift4 may have leverage to assist. Is there any sort of backstop agreement we can put in place outlining your willingness to assist me in the event of a Vista challenge? I'd like to avoid the possibility of leaving one company and getting blocked from the other. Having something like this in place will give me and my family confidence to make this transition.
> (ECF No. 37-1.)

On June 26, 2019, Shift4 provided Mr. Hoffman a "Transition Assistance" agreement wherein Shift4 agreed to pay Mr. Hoffman's legal fees should Upserve seek to enforce the Agreement. (ECF No. 18-9.)

On June 28, 2019, Mr. Hoffman advised Mr. Isaacman that he desired to wait until after his Upserve stock options vested (on July 14th) to formally submit his resignation to that company. *Id.*

Mr. Hoffman submitted his resignation to Upserve on July 15, 2019, to be effective August 2, 2019. (ECF No. 17-16.) Although the Agreement required him to notify Upserve of any new employment upon request, Hoffman did not disclose to Upserve that the purpose of his resignation was to take a position with Shift4 after he received an email from Upserve's CEO reminding him of that obligation.[4] (ECF

---

[4] The Agreement provides that "[b]efore Employee accepts Employment or enters into any consulting, independent contractor, or other professional or business engagement with any other person or entity … Employee agrees that, upon the request of the

No. 18-10.)  Instead, he informed Upserve's CEO that he was going to sell his house and move to Philadelphia and see what he wanted to do.  (ECF Nos. 27 ¶ 57; 18-2 at 116; 35-2.)

After departing Upserve, Mr. Hoffman updated his LinkedIn page to reflect that fact but did not indicate his new employment at Shift4.  (ECF No. 27 ¶ 79.) Additionally, Shift4 did not list Mr. Hoffman on the "Executive Team" page of its website though it had previously posted a formal announcement of the hiring of a new Chief Development Officer.  *Id.*  Upserve learned about Mr. Hoffman's employment when Shift4 announced on its own LinkedIn page, in mid-October 2019, that Shift4's "Chief Product Officer" (Mr. Hoffman) would be speaking at a trade show about Shift4's product, Skytab.  *Id.* ¶ 78; ECF No. 18-2 at 135.

### E.  Hoffman's Employment with Shift4

While he was an employee of Shift4, Mr. Hoffman and Mr. Isaacman's written communications discuss developing analytics to compete with Upserve.  For example, an October 14, 2019, email to Shift4 from one of its vendors, Micros Retail Systems, Inc. ("Micros"), stated as follows:

> Upserve has become an obstacle in many of our groups including Soho House [a customer of Upserve].  The "analytics" are essential to operations with a few examples listed:
>
> > Identifies repeat customers
> > Where customers live
> > Items they order
>
> Dave Hoffman is new to Shift4 from Upserve which is a plus but to date

---

Company, Employee will furnish the Company with the name and address of any new employer  ...."  (ECF No. 18-5 ¶ 17.)

I am have not received any information regarding S4 analytics to take on this challenge.
(ECF No. 18-2 at 4.)

Mr. Isaacman responded that "Lighthouse is our solution to beat Upserve analytics. This is why we hired Dave Hoffman to ensure our analytics are best in class, but it won't be there overnight.  [It's] going to take time to achieve parity." *Id.* at 3.

Mr. Isaacman then added Hoffman to the email to chain to respond to Micros' question regarding the length of time to achieve parity.  *Id.* at 2-3.  Mr. Hoffman responded as follows:

> I've included a few comments below but it may be a good idea to connect for a quick product review as there are many details here.  We could cover both LH [Lighthouse] capabilities + direction and Upserve competitive in a 30-45 min call.  It may also be a good idea to pull a few of your customers into our requirements process as we plan for Q1/Q2 enhancements….
>
> Upserve requires their payment processing to deliver analytics.  There is no product option without payments.
>
> The functionality in the Upserve platform today is fairly mature but delivery of new innovation and capabilities has significantly slowed over the past 2.5 years as their PE sponsor has been pressing on EBITDA and slowing product investment. … But the analytics gap between Upserve and Lighthouse is large and it will take us a number of quarters of investment to craft a competitive story.
>
> Our current LH focus is UX improvements and consistency across the product, and we are putting together requirements for a business health dashboard & daily digest email for Q1 delivery.  This will be the first significant step toward analytics parity with Upserve & Womply.  I anticipate having a compelling story (growth & focus, not parity) by the start of 2H '20 as we make these new investments and continue to build out areas of our product that are already superior, including:
>
> 1)  Our PATT solution is best in class and Upserve does not yet have anything in this category.
> 2)  Our customer database, segmentation and engagement is very good

and should be a focus since Upserve, while collecting names in transaction history, lacks any sort of actionability beyond segmentation.

*Id.* at 2.

### F.  Mr. Hoffman Retained Upserve Documents After Leaving the Company

During his employ with Upserve, Mr. Hoffman was provided with two cloud-based storage drives for Upserve documents and was precluded by company policy from using a personal cloud-based storage, such as Dropbox.  (ECF No. 18-1 at 40.) Nevertheless, Mr. Hoffman uploaded what he estimates were thousands of Upserve documents to his personal Dropbox account and retained them when he began employment with Shift4.  *Id.* at 41.  These documents included screenshots from Mr. Hoffman's last day at Upserve and the weeks leading up to it that demonstrated analytics as applied to one of Upserve's customers, competitive analyses, Upserve's roadmap for various future projects, lists of Upserve customers along with those customer's contracted rates, documents and other files related to several potential mergers and acquisition targets, among many others.  *Id.* at 146-50.  Additionally, Mr. Hoffman emailed certain Upserve documents to his personal Gmail account after he had submitted his resignation.  *Id.* at 140.

After commencement of this litigation, Upserve and Mr. Hoffman entered into a "Stipulated Protocol for David Hoffman's Dropbox" to be "used for the imaging of Hoffman's personal Dropbox cloud-based storage account … and the subsequent deletion of data and information stored on the Hoffman Dropbox."  (ECF No. 20-3.) Through this stipulation, Mr. Hoffman warranted that he would not access the Dropbox and that he has not delivered to Shift4, and to his knowledge Shift4 has not

received, any of the Upserve documents in his Dropbox.  *Id.*  Further, Mr. Hoffman represented and warranted that he would not deliver any Upserve documents, that were in his Dropbox, to Shift4.  *Id.*

### G. The Instant Litigation

On October 16, 2019, after learning of Mr. Hoffman's employment at Shift4, Upserve sent Mr. Hoffman a letter demanding that he cease and desist from violation of his restrictive covenants.  (ECF No. 17-23.)  Upserve also sent a letter to Shift4 demanding it cease and desist from employing Hoffman and requesting that Shift4 confirm that Mr. Hoffman has not disclosed any confidential or proprietary information.  (ECF No. 27 ¶ 82.)  Shift4 responded that it did not consider Upserve to be a competitor and would continue to employ Mr. Hoffman.  *Id.*

Upserve therefore filed suit against Mr. Hoffman in this Court on November 14, 2019, alleging that Mr. Hoffman (1) breached the Agreement; (2) breached his fiduciary duty to Upserve; (3) violated the Defense of Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836 *et seq.*; and (4) violated the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030 *et seq.*  (ECF No. 1.)

Upserve amended its complaint on January 29, 2020, adding Shift4 as a defendant, alleging that it violated the DTSA, CFAA, and tortiously interfered with Upserve's contractual relationship with Mr. Hoffman. (ECF No. 27.)

### II.    PRELIMINARY INJUNCTION STANDARD

"In determining whether to grant a preliminary injunction, the district court must consider: (i) the movant's likelihood of success on the merits of its claims; (ii)

14

whether and to what extent the movant will suffer irreparable harm if the injunction is withheld; (iii) the balance of hardships as between the parties; and (iv) the effect, if any, that an injunction (or the withholding of one) may have on the public interest." *Corp. Techs., Inc. v. Harnett*, 731 F.3d 6, 9 (1st Cir. 2013). The Court should not award the "extraordinary and drastic remedy" of a preliminary injunction unless Upserve meets its burden of persuasion with "substantial proof." *See Marzurek v. Armstrong*, 520 U.S. 968, 972, 117 S. Ct. 1865, 138 L.Ed.2d 162 (1997).

## III.   DISCUSSION

### A.  Upserve's Motion for a Preliminary Injunction Against David Hoffman: Breach of Contract

Mr. Hoffman contends that a preliminary injunction should not issue on Upserve's breach of contract claim because, in his view, Shift4 and Upserve are not competitors.  In such a case, enforcement of the Agreement's non-competition provision would be unwarranted.[5]  The Court therefore will first consider whether Upserve has demonstrated by substantial proof that it and Shift4 are competitors

---

[5] For ease of reference, the non-competition provision of the Agreement provides in relevant part:

> "[Hoffman] expressly agrees that [Hoffman] will not (either directly or indirectly, by assisting in concert with others) Compete with the Company during the Restricted Period within the Restricted Territory." "Compete" means "to provide Competitive Services, whether [Hoffman] is acting on behalf of himself/herself, or in conjunction with or in concert with any entity, person, or business."  "Competitive Services" are "the business of providing products or services (including but not limited to technical and product support, professional services, technical advice and other customer services) of the type provided, conducted, or offered by the Company or any predecessor within the two (2) years prior to the termination of your employment."

and then whether Mr. Hoffman is providing "Competitive Services" to Shift4; that is products or services of the type he provided Upserve in the last two years of his employ with that company. If so, the Court must then consider whether the Agreement is "reasonable" under Rhode Island's law on restrictive covenants.[6] The Court will then consider whether Upserve has met all factors for an issuance of a preliminary injunction.

### 1. Are Shift4 and Upserve Competitors?

Mr. Hoffman argues that he does not "Compete" with Upserve because Shift4 is not a competitor company as it sells its products and services to a "substantially broader and different marketplace of customers and end users." (ECF No. 20-1 at 7.) While Shift4 may have customer base beyond restaurants, the following overlap in products and services available to restaurant businesses are undisputed:

- Both Upserve and Shift4 provide point-of-sale systems to the restaurant industry. Shift4's website claims that it is the "industry-leading provider of Restaurant POS Software" and has four of its own restaurant-focused point-of-sale systems.

- Both Upserve and Shift4 products provide payment processing.

- Both Upserve and Shift4 products provide order- and pay-at-the-table solutions.

---

[6] Rhode Island law governs because the Agreement provides that "[a]ny non-arbitration-covered disputes shall be resolved under the substantive laws and in the jurisdiction of the state where Employee most recently worked for the Company." (ECF No. 18-5 ¶ 28.) Mr. Hoffman worked at Upserve's principal place of business in Providence, Rhode Island.

- Both Upserve and Shift4 products provide business reporting features.

- Both Upserve and Shift 4 products allow for several add-ons, including restaurant inventory software, menu reporting, online review monitoring, customer loyalty reporting, and marketing tools.

Furthermore, the documentary evidence created before initiation of this lawsuit points toward an understanding of competition between the two companies. Mr. Hoffman described Upserve on his resume as a "technology & payments company" (which services restaurants), while Shift4 claims that it provides "the most secure payment technologies" to (among others) restaurants. (ECF Nos. 17-2; 18-6.) Indeed, Upserve identified Shift4 in several internal competitive analyses (though not all) prior to Mr. Hoffman's departure from that company. *See* ECF Nos. 24-1, 2, 3; *but see* ECF No. 21-2 at 2-4; ECF No. 35-4.

Emails exchanged while Mr. Hoffman was being recruited by and employed at Shift4, but before the filing of this lawsuit, also demonstrate competition between the businesses. In these emails Mr. Hoffman discussed the apparent targeting of Upserve customers and the development of analytics to compete with Upserve. (ECF Nos. 16-13, 16-15.) The emails also indicate that one purpose for Shift4's hiring Mr. Hoffman was to "beat Upserve." (ECF No. 18-2 at 3.) Therefore, the Court finds that the affidavit provided by Shift4's Chief Technology Officer, Michael L. Russo, in which he asserted that he and Mr. Hoffman discussed the fact that the two companies were not competitors prior to Mr. Hoffman's employment at Shift4, to be lacking in credibility. (ECF No. 31-2 ¶¶ 3-4.)

While the defendants argue that Shift4 is not a competitor because it does not have analytics comparable to Upserve, this does not indicate a lack of competition. Instead, it simply indicates that Upserve is ahead of Shift4 in the competition. Furthermore, the fact that Shift4 has not yet developed analytics is unsurprising given Mr. Hoffman's statement in an October 14, 2019 email that it would take several quarters for Shift4 to narrow the analytics gap with Upserve. (ECF No. 18-2 at 2.)

The Court thus concludes that Upserve and Shift4 are competitors.

### 2. Are the Services Mr. Hoffman Is Providing to Shift4 The Same Services He Provided Upserve?

The Court must next consider whether Mr. Hoffman, as Chief Product Officer for Shift4, is providing that company with services of the type he provided to Upserve as its Executive Vice President of Product. Among Mr. Hoffman's duties as EVP of Product at Upserve was oversight of product strategy. (ECF No. 27 ¶ 30.) As noted, the Court finds that the two companies offer products to the restaurant industry that offer the same services. As Chief Product Officer for Shift4, Mr. Hoffman's duties also included responsibility for product strategy. (ECF No. 20-2 ¶ 22.) In fact, he presented on Shift4's competitive products at a trade show in October 2019. (ECF No. 27 ¶ 78; ECF No. 18-2 at 135.)

Shift4's CEO acknowledged, in email communications, that Shift4 had hired Mr. Hoffman to "achieve parity" with Upserve. That statement, coupled with its failure to announce the hiring, in contrast to its previous practice for executive hiring, lead to the conclusion that Mr. Hoffman's role for Shift4 would include the same

services he performed for Upserve.  (ECF Nos. 18-2 at 3; 27 ¶ 79.)

The Court therefore finds that Mr. Hoffman is providing to Shift4 "Competitive Services" as that term is defined in the Agreement.

### 3.  Is The Agreement Is Reasonable?

Having determined that Upserve and Shift4 are competitors and that Mr. Hoffman is providing to Shift4 the same type of services he provided to Upserve, the Court now considers whether the Agreement is reasonable under Rhode Island law. "[A] party seeking to enforce a covenant not to compete must first establish three threshold requirements: (1) the covenant 'is ancillary to an otherwise valid transaction or relationship, such as an employment contract'; (2) the covenant 'is supported by adequate consideration'; and (3) the covenant is designed to protect a 'legitimate interest' of the employer." *CVS Pharmacy, Inc. v. Lavin*, 951 F.3d 50, 55 (1st Cir. 2020) (quoting *Durapin, Inc. v. Am. Prods., Inc.*, 559 A.3d 1051, 1053 (R.I. 1989)).

Mr. Hoffman does not challenge the Agreement at these threshold requirements.  Nevertheless, the Court finds that the Agreement certainly was "ancillary to an otherwise valid transaction or relationship" (Mr. Hoffman's employment); was supported by the consideration of the raises he was given for agreeing to restrictions on future employment; and sought to protect Upserve's proprietary information, a legitimate interest.

Next, the Court must consider whether the Agreement is reasonable.  "It is well settled that covenants not to compete are disfavored and subject to strict judicial

scrutiny." *Cranston Print Works Co. v. Pothier*, 848 A.2d 213, 219 (R.I. 2004). The Rhode Island Supreme Court has made clear that the reasonableness of a restrictive covenant is fact-specific: "[w]hen considering the validity of a noncompetition agreement, the crucial issue is reasonableness, and that test is dependent upon the particular circumstances surrounding the agreement." *CVS Pharmacy*, 951 F.3d at 56 (quoting *Durapin*, 559 A.2d at 1053). However, reasonableness is "ultimately a question of law to be determined by the court." *Durapin,* 559 A.2d at 1053. Under the "doctrine of partial enforcement," Rhode Island courts "may modify overly broad covenants to the extent reasonable, so long as there is no bad faith or deliberate overreaching by the employer." *CVS Pharmacy*, 951 F.3d at 56.

> Reasonableness of non-competition agreements 'turns on: (1) whether the provision is narrowly tailored to protect the legitimate interests; (2) whether it is reasonably limited in activity, geographic area, and time; (3) whether the promisee's interests are not outweighed by the hardship to the promisor; and (4) whether the restriction is likely to injure the public.'
> *CVS Pharmacy, Inc. v. Lavin*, 384 F. Supp. 3d 277, 236 (D.R.I. 2019) (quoting *F. Saia Restaurants, LLC v Pat's Italian Food to Go, Inc.*, 2012 WL 2133511, at *7 (R.I. Super. Ct. June 06, 2012)) (internal citations omitted).

Mr. Hoffman challenges only the third reasonableness factor, the "hardship" prong. The Court does find, however, that the Agreement is narrowly tailored to meet the other reasonableness factors given that Shift4 is a competitor business. Thus, the Agreement meets the factors using either the "as-applied approach," where the Court "assess[es] reasonableness based on the facts of a given case" or the "facial approach" where the Court considers the reasonableness of the covenant on its terms but may permit "enforcement of overly broad covenants to the extent reasonable, so

long as there is no bad faith or deliberate overreaching by the employer." *See CVS*

*Pharmacy,* 951 F.3d at 57, 60.  The defendants here have presented no evidence that

Upserve acted in bad faith or deliberately overreached.

Turning to the "hardship" factor, Mr. Hoffman argues that Rhode Island law

does not support the enforcement of a non-compete agreement where the restraint on

trade unfairly prevents the employee from working in his or her primary field of

expertise or experience.  (ECF No. 20-1 at 12-13.)  Mr. Hoffman, however, is unlike

the defendant salesperson in *Nestle Food Co. v. Miller*, 836 F. Supp. 69, 75-76 (D.R.I.

1993).  There the court determined that Nestle had not demonstrated that, to protect

its legitimate interests, it needed to prohibit salespeople from working for a

competitor in their former territory.  That restriction unduly required salespeople to

change locations and work outside of their expertise.  Instead, Mr. Hoffman was an

executive at the highest level of Upserve.  He had responsibility, nationally, for

product development and strategy and had access to proprietary information.  The

case therefore is analogous to the recent First Circuit opinion of *CVS Pharmacy Inc.*

*v. Lavin*, where the Court, in upholding the granting of a preliminary injunction on a

noncompetition agreement governed by Rhode Island law, held that it "strains

credulity to think that a top-echelon executive … could develop a strategy for [a

competitor] without dipping into" his "extensive knowledge" of his prior employer's

"strategic initiatives and detailed information about its contracts."  951 F.3d at 59.

Like the competitor company in *CVS Pharmacy*, Shift4 hired Mr. Hoffman at

least in part to bring Shift4 on par with Upserve "because of his knowledge of

strategic initiatives developed by a major industry player" and confidential information to inform that strategy from his years at Upserve. *See Id.* Therefore, despite his representations to the contrary, Mr. Hoffman cannot conceivably perform his role at Shift4 without breaching the Agreement.

Furthermore, the Agreement does not preclude Mr. Hoffman from using his expertise in technological solutions—just that he not do so for a competitor company and for a period of one year. During that time, he is free to seek employment with non-competing companies that develop technological products in other industries or markets.

The Court therefore finds that Upserve has demonstrated, by substantial proof, that its legitimate interests—to protect its proprietary interests and maintain its position as a market leader—outweigh the hardship to Mr. Hoffman.

### 4. The Agreement's Tolling Provision

The Agreement includes a tolling provision which provides that "[t]he Restricted Period as defined in this Agreement may be extended during the pendency of any litigation (including appeals) or arbitration proceeding, in order to give [Upserve] the full protection of the restrictive covenants described in this Agreement." (ECF No. 18-5 ¶ 12.) "A bargained-for tolling provision can protect an employer in the event that it does not discover a breach of a restrictive covenant until well into the restraint period." *EMC Corp. v. Arturi*, 2010 WL 5187764, at *5 (D. Mass. Dec. 15, 2010), *aff'd*, 655 F.3d 75 (1st Cir. 2011). *See also DeWolf v. Usher Cove Corp.*, 721 F. Supp. 1518, 1535 (D.R.I. 1989) (allowing time limit to be tolled

during the time that the plaintiff was seeking redress with the court in good faith).

Here, Upserve did not discover Mr. Hoffman's employment with Shift4 because he failed to report it to Upserve in contravention of the Agreement and he concealed the purpose of his resignation. Moreover, Shift4 did not publicly announce the hiring which was in contrast to its previous practice. When Upserve did discover Mr. Hoffman's new employment, it acted immediately to seek to enforce the Agreement and has done so in good faith.

As such, the Court finds that the tolling provision is reasonable and should be applied under the facts of this case.

### 5.  The Preliminary Injunction Factors

The Court now considers whether Upserve has met its burden to meet all of the factors necessary for the Court to issue a preliminary injunction: "(i) the movant's likelihood of success on the merits of its claims; (ii) whether and to what extent the movant will suffer irreparable harm if the injunction is withheld; (iii) the balance of hardships as between the parties; and (iv) the effect, if any, that an injunction (or the withholding of one) may have on the public interest." *Harnett*, 731 F.3d at 9.

### a.  Likelihood of Success on the Merits

As the Court has found that Upserve and Shift4 are competitors, that Mr. Hoffman provides to Shift4 the same type of services he provided to Upserve, and that the non-competition Agreement is reasonable, it concludes that Upserve is likely to succeed on the merits of its breach of contract claim against Mr. Hoffman.

### b.  Irreparable Harm

Upserve contends that it has suffered and will suffer irreparable harm because of Mr. Hoffman's working for a competitor.  His extensive knowledge of Upserve's confidential information will cause Upserve to lose its position as market leader and to lose the goodwill it has developed with its customers.  Although Mr. Hoffman argues that Upserve's potential for harm is merely speculative, the risk of disclosure of confidential information to a competitor "presents a sufficient risk of irreparable harm to justify a preliminary injunction."  *CVS Pharmacy*, 384 F. Supp. 3d at 237 (citing *Saban v. Caremark Rx, LLC*, 780 F. Supp. 2d 700, 731 (N.D. Ill. 2011) ("Rhode Island courts have enjoined former employees when the employee's knowledge of confidential information is likely to damage the former employer."); *City Hall Elec. Supply, Inc. v. Rossi*, 1988 WL 1017316 at *2 (R.I. Super. Ct. Mar. 2, 1988) (CEO was enjoined from competing for three years within the state because he was going to perform "the same work" for a competitor and admittedly possessed tangible confidential information from old employer).  *See also Harlan Labs, Inc. v. Campbell*, 900 F. Supp. 2d 99, 108 (D. Mass. 2012) ("As a general rule, a breach of non-compete agreements tied to trade secrets concerns triggers a finding of irreparable harm.").

The Court thus finds that Upserve has demonstrated substantial proof it will suffer irreparable harm if Mr. Hoffman remains in his position at Shift4.  Moreover, although Mr. Hoffman already has begun working for Shift4, the risk of irreparable harm will only continue should Mr. Hoffman remain employed with that company.

24

### c.  Balance of the Equities

The balance of the equities also favors Upserve.  In exchange for an increased salary and bonus potential, the Agreement required Mr. Hoffman not work in the same capacity for a competing company for one year after leaving Upserve.  Instead, he departed Upserve in a far less than forthcoming manner and put its confidential information at risk.  And this after being advised by an attorney that the Agreement put him in a "weak position" to do so.

### d.  Public Interest

Upserve satisfies the public interest factor, too, as "the public has a strong interest in preserving the integrity of contracts and protecting confidential business information from competitors." *CVS Pharmacy*, 384 F. Supp. 3d at 238, *aff'd on other grounds*, 951 F.3d 50 (1st Cir. 2020).

## B.  Upserve's Motion for a Preliminary Injunction Against Mr. Hoffman: Defense of Trade Secrets Act Claim

Upserve also moves for a preliminary injunction against Mr. Hoffman for his alleged misappropriation of Upserve's trade secrets and his resultant violation of the Defense of Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836 *et seq.*  While the DTSA provides for injunctive relief for the actual or threatened misappropriation of "trade secrets," the relief available in this instance is not more expansive than the relief the Court grants on Upserve's breach-of-contract claim.[7]  *See* 18 U.S.C. § 1836(b)(3)(A).

---

[7] The DTSA does allow for an award of attorneys' fees under certain circumstances, however, the current record does not support such an award.  *See* 18 U.S.C. § 1836(b)(3)(D) ("[I]f a claim of the misappropriation is made in bad faith, which may be established by circumstantial evidence, a motion to terminate an injunction is

As such, the Court presently need not make any findings on Upserve's motion as it relates to its DTSA claim.

## C. Upserve's Motion for a Preliminary Injunction Against Shift4

Upserve also moves for an injunction against Shift4 on its claims for violation of the DTSA and for tortious interference with its contract with Mr. Hoffman.  The granting of the motion against Mr. Hoffman, however, ends his employment at Shift4 for the one-year period specified in the Agreement and requires that he cease any use or disclosure of any of Upserve's documents in his possession.  Upserve therefore is no longer at risk of irreparable harm, an essential element in a prayer for a preliminary injunction.  *See Charlesbank Equity Fund II v. Blinds To Go, Inc.*, 370 F.3d 151, 162 (1st Cir. 2004) ("[I]rreparable harm constitutes a necessary threshold showing for an award of preliminary injunctive relief.").  Instead, should Upserve prove its claims at a later litigation stage, it will have an adequate remedy at law (a monetary award) for any damages which Shift4's actions allegedly have caused.  *See Voice of the Arab World, Inc. v. MDTV Medical News Now, Inc.*, 645 F.3d 26, 32 (1st Cir. 2011) ("Irreparable injury is one that is not resolved through legal remedies."); *Charlesbank Equity Fund II*, 370 F.3d at 162 ("Irreparable harm most often exists where a party has no adequate remedy at law.").  *See also Adam–Mellang v. Apartment Search, Inc.,* 96 F.3d 297, 300 (8th Cir. 1996) (holding that "harm that had already occurred [can] be remedied through damages").

_____

made or opposed in bad faith, or the trade secret was willfully and maliciously misappropriated, [the court may] award reasonable attorney's fees to the prevailing party.").

The Court therefore denies Upserve's Motion as it relates to its claims against Shift4.

## IV.   CONCLUSION

Because the Court finds that Upserve has met the standard for a preliminary injunction with respect to its breach of contract claim against Mr. Hoffman, the Court GRANTS Upserve's Motion (ECF No. 17) on that count.   The Court DENIES Upserve's Motion for a Preliminary Injunction on its DTSA claim against Mr. Hoffman and DENIES Upserve's Motion against Shift4 (ECF No. 28) in its entirety.

The Court hereby issues the following PRELMINARY INJUNCTION:

1. Against Mr. Hoffman requiring him to immediately cease employment with Shift4 and to cease and desist from directly or indirectly, whether on behalf of himself or in conjunction with any other entity, person, or business, providing to Shift4 products or services of the type provided, conducted, or offered by Upserve from August 2, 2017 through August 2, 2019, from the date of this Order until the earlier of (i) one year from the date of this Order; or (ii) any further action of this Court in connection with any forthcoming motion for permanent injunction;
2. Against Mr. Hoffman, and all those acting in concert with him or on his behalf, requiring them to cease and desist from any use and/or disclosure of and/or copying of any and all documents and information in their possession, custody or control, relating to the business of Upserve, including but not limited to the information copied from Upserve's company-provided computer and/or Upserve's system onto Mr. Hoffman's personal Dropbox and Gmail accounts.

IT IS SO ORDERED.

_Mary S. McElroy_
Mary S. McElroy
United States District Judge
**April 28, 2020**